UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

**FILED**
NOV 14 2017

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>HARLAN JAMES TWO EAGLE,<br><br>Defendant. | 3:16-CR-30136-RAL<br><br>REPORT AND<br>RECOMMENDATION ON<br>MOTION TO SUPPRESS<br>STATEMENTS |

Harlan James Two Eagle is accused of engaging in a sexual act, by use of force, with a female acquaintance. He seeks to suppress the unwarned statements he made after being handcuffed and arrested. Because some of his statements were evoked in violation of *Miranda*, but others were not, his Motion should be granted in part and denied in part.

## BACKGROUND

Shortly after midnight on December 22, 2015, Terri Searby reported that she had been sexually assaulted. Richard Kumley, a police officer for the Rosebud Sioux Tribe, responded to White Horse Housing, just east of Mission, South Dakota, and found Searby on the front steps to house number 495. Searby told him that she had been drinking at her friend's house and one of the people there was Two Eagle. She had been sitting on the couch in the living room of the residence and eventually fell asleep.

Later on, she woke up in a bedroom with Two Eagle on top of her. She no longer had her pants or underwear on and her shirt was pushed up. And her hands were together, pinned across her chest, and he was pushing down on her. Searby thought Two Eagle's penis was inside her but she was not sure. Despite her pleas for him to stop, he would not do so. At some point, Searby hit Two Eagle in the face and was able to push him off of her. Once free, she scurried to the bathroom, where she put clothes on, and left the house to call for help.

Searby directed Officer Kumley around the corner to house number 492 – the house she had been in when she had her encounter with Two Eagle. She stayed in Kumley's patrol car while he approached and entered the home through the front door of it. Inside the residence were Two Eagle; his sister and brother, Dieta and Vine Two Eagle; his 9-year-old niece, A.T.E.; and Raqual (Kelly) Thunderhawk. All of the adults had been drinking alcoholic beverages. Kumley handcuffed Two Eagle (initially telling him he was detained) and then, in the course of less than three minutes, placed him under arrest for sexual assault. Afterward, Kumley asked Two Eagle, and everyone else in the home, a number of questions. No *Miranda* warnings were ever given. Rebuking the offense he was arrested on, Two Eagle adamantly maintained he did not do anything – of a criminal nature or otherwise – to Searby. The entire colloquy, from the time Kumley arrived until he left with Two Eagle, was recorded on Kumley's body cam.

A federal grand jury ultimately indicted Two Eagle and charged him with aggravated sexual abuse. Following his arraignment and not guilty plea, he moved to

2

suppress the statements he made to Officer Kumley. The Court held an evidentiary hearing on the Motion, heard testimony (from Kumley), and received three exhibits (a compact disc of the body cam recording and transcripts of the same) into evidence.

## DISCUSSION

### A. Interrogation

Two Eagle initially claims he was subject to custodial interrogation without first being advised of his *Miranda*[1] rights. Specifically, he argues the un-Mirandized questioning of him requires suppression of certain statements he made while handcuffed and after being arrested. It is clear Two Eagle was never given any *Miranda* warnings. And there is no real dispute Two Eagle was in custody when he spoke. The only question is whether he was interrogated.

Under the Fifth Amendment, a suspect is guaranteed the right to remain silent and to the assistance of counsel during custodial interrogation.[2] If the suspect is not informed of his rights while in custody then any statements gained from interrogating him are generally inadmissible as substantive evidence.[3]

---

[1] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

[2] *See Miranda*, 384 U.S. at 444-45.

[3] *See Dickerson v. United States*, 530 U.S. 428, 432, 441 (2000); *Stansbury v. California*, 511 U.S. 318, 322 (1994); *Oregon v. Elstad*, 470 U.S. 298, 317 (1985); *United States v. Sanchez*, 676 F.3d 627, 630 (8th Cir. 2012).

3

For purposes of *Miranda*, "interrogation . . . must reflect a measure of compulsion above and beyond that inherent in custody itself."[4] Interrogation includes not only express questioning, but also words or conduct an officer should know are "reasonably likely to elicit an incriminating response from the suspect."[5] This latter test "focuses primarily upon the perceptions of the suspect, rather than the intent of the police . . . . A practice that the police should know is reasonably likely to evoke an incriminating response from [the] suspect thus amounts to interrogation."[6] But the police "cannot be held accountable for the unforeseen results of their words or actions."[7]

*Miranda* does not bar, from use at trial, volunteered or spontaneous statements made during a conversation not initiated by a police officer.[8] And the officer's request for clarification of a volunteered or spontaneous statement generally does not amount to interrogation as conceptualized in *Miranda*.[9]

---

[4]*Butzin v. Wood*, 886 F.2d 1016, 1018 (8th Cir. 1989) (*quoting Rhode Island v. Innis*, 446 U.S. 291, 300 (1980)), *cert. denied*, 496 U.S. 909 (1990).

[5]*Pennsylvania v. Muniz*, 496 U.S. 582, 600-01 (1990) (*quoting Innis*, 446 U.S. at 301).

[6]*Innis*, 446 U.S. at 301.

[7]*Id.* at 301-02.

[8]*See Miranda*, 384 U.S. at 478; *United States v. Chipps*, 410 F.3d 438, 445 (8th Cir. 2005); *United States v. McCoy*, 200 F.3d 582, 584 (8th Cir. 2000); *United States v. Hatten*, 68 F.3d 257, 262 (8th Cir. 1995), *cert. denied*, 516 U.S. 1150 (1996); *see generally* 2 Wayne R. LaFave, Jerold H. Israel, Nancy J. King & Orin S. Kerr, *Criminal Procedure*, §6.7(d) (4th ed. 2016) (volunteered statements and follow-up questioning).

[9]*See United States v. Jackson*, 852 F.3d 764, 772 (8th Cir. 2017); *United States v.*
(continued...)

4

1. **Pre-Arrest Statements**

After handcuffing Two Eagle but before arresting him, Officer Kumley asked everyone present, "What was all going on here tonight?"[10] Kumley then engaged in conversations with Kelly and A.T.E. for a little over a minute. Following these conversations and a three-second pause, Two Eagle made the comment, "I don't even know what's going on with that stuff right here."[11] Kumley inquired what Two Eagle meant by this and a brief dialogue ensued about Two Eagle "just trying to lay down" and "where" that was.[12]

The line between impermissible interrogation and lawful follow-up questions to volunteered statements is a fine one. An officer may listen to volunteered statements and need not interrupt a suspect, who is spontaneously providing information, and deliver *Miranda* warnings.[13] The officer may even interrupt a volunteered statement to ask follow-up questions.[14] That said, when asking the suspect about volunteered

---

*Crisolis-Gonzalez*, 742 F.3d 830, 837 (8th Cir. 2014); *Chipps*, 410 F.3d at 445; *United States v. Koontz*, 143 F.3d 408, 411 (8th Cir. 1998); *see generally* 2 Criminal Procedure, §6.7(d) & nn.168-70.

[10]Mot. Hrg. Ex. 1 at 12:37-40 (Oct. 31, 2017).

[11]*Id.* at 13:48-50.

[12]*Id.* at 13:51-14:11.

[13]*See Miranda*, 384 U.S. at 478.

[14]*See Chipps*, 410 F.3d at 445; *Koontz*, 143 F.3d at 411; *Butzin*, 886 F.2d at 1018; *see also United States v. Rommy*, 506 F.3d 108, 132-33 (2d Cir. 2007) (collecting cases), *cert.*
(continued...)

information, the officer may cross the line into "express questioning or its functional equivalent"[15] outlawed by *Miranda*. The difference between legitimate follow-up questions and proscribed interrogation turns on whether the officer is seeking clarification of something the suspect has just said or whether, instead, the officer is looking to expand the interview.[16]

Here, Two Eagle's initial statement was made spontaneously[17] and after a general, benign inquiry or salutation.[18] And his later statements were in response to attempts, on the part of Officer Kumley, to clarify or confirm what Two Eagle had already volunteered.[19] Kumley's follow-up questions were not designed to broaden Two Eagle's statements, enhance his guilt, or raise the offense to a higher degree.[20]

---

*denied*, 552 U.S. 1260 (2008).

[15]*Innis*, 446 U.S. at 300-01.

[16]*See Chipps*, 410 F.3d at 445; *generally* 2 *Criminal Procedure*, §6.7(d) & n.169.

[17]*See United States v. Cowan*, 674 F.3d 947, 958 (8th Cir.), *cert. denied*, 568 U.S. 922 (2012); *United States v. Howard*, 532 F.3d 755, 761-62 (8th Cir. 2008); *Chipps*, 410 F.3d at 445; *United States v. Lockett*, 393 F.3d 834, 838 (8th Cir. 2005), *cert. denied*, 546 U.S. 1198 (2006); *Butzin*, 886 F.2d at 1018.

[18]*See* 2 *Criminal Procedure*, §6.7(b) & n. 70.

[19]*See United States v. Jones*, 842 F.3d 1077, 1083 (8th Cir. 2016); *Chipps*, 410 F.3d at 445-46; *Lockett*, 393 F.3d at 838; *Koontz*, 143 F.3d at 411; *Hatten*, 60 F.3d at 262; *Butzin*, 886 F.2d at 1018.

[20]*See Chipps*, 410 F.3d at 445-46; *Butzin*, 886 F.2d at 1018; *see generally* 2 *Criminal Procedure*, §6.7(d) & nn. 169-70.

## 2. Arrest Statements

Next, in the sequence of events, Officer Kumley advised Two Eagle, "Now you're under arrest, okay?"[21] Two Eagle asked, "For what?"[22] Kumley replied that the arrest was for sexual assault.[23]

Informing Two Eagle he was no longer detained but "[n]ow . . . under arrest" did not amount to interrogation.[24] The arrest notification was not something that "invited" an incriminating response or that was "particularly 'evocative.'"[25] What's more, it is debatable whether Two Eagle's questions, after the notification, were even "incriminating."[26] Regardless, no legal basis exists to exclude the statement or any of the succeeding inquiries Two Eagle made about his arrest.[27]

---

[21]Mot. Hrg. Ex. 1 at 14:26-28.

[22]*Id.* at 14:28-29.

[23]*See id.* at 14:30-31, 14:38-39.

[24]*See Innis*, 446 U.S. at 301-03; *see generally* 2 *Criminal Procedure*, §6.7(b) (questioning that constitutes *Miranda* "interrogation").

[25]*Innis*, 446 U.S. at 302-03; *see also Jones*, 842 F.3d at 1084 (suspect's volunteered statement, right after being handcuffed, was admissible); *United States v. Orr*, 636 F.3d 944, 954 (8th Cir. 2011) (suspect's post-arrest statements, made while being handcuffed and escorted to the patrol car, did not run afoul of *Miranda*); *Lockett*, 393 F.3d at 836-38 (statements suspect made, after his arrest and while being handcuffed, not the product of police interrogation).

[26]*See id.* at 301, n. 5.

[27]*See id.* at 301-03; *Crisolis-Gonzalez*, 742 F.3d at 836-37; *Howard*, 532 F.3d at 762; *Lockett*, 393 F.3d at 838; *see also United States v. Jackson*, 863 F.2d 1168, 1172-73 (4th Cir. 1989) (no interrogation where police officer responded to defendant's inquiry as to
(continued...)

7

### 3. Post-Arrest Statements

But the same is not true of other statements Two Eagle made to Officer Kumley later on, namely:

1. "Right over here. * * *With my fucking sister and my fucking everybody. What the fuck man?"; in response to probing into where Two Eagle tried falling asleep that night.

2. "Fuck no, this is just us right here. Man, what the fuck?"; following inquiries about Searby and who was in the home.

3. "Yeah, just us. What the fuck?"; answering the question, "There was nobody else here?"

4. "Nooo! *** What the fuck with that shit man!"; as a retort to importuning on whether Searby had been there.

5. "Over here."; after being asked, "Which bedroom he was laying in."

6. "Everybody was sitting, everybody was sitting in the fucking living room."; in reply to where "they" were laying and who "they" were.[28]

Two Eagle was subjected to express questioning or at least to the "functional equivalent" of it. Before entering the house, Officer Kumley had already interviewed Searby and obtained a statement from her as to what happened. He therefore should have known that conversations with everyone in a small room together were reasonably likely to generate incriminating responses from Two Eagle. Whether Kumley directed his questions to Two Eagle, to one or more of the group, or to the

---

reasons for his arrest); *see generally* 2 *Criminal Procedure*, §6.7(c) & nn.146-48.

[28]*See* Mot. Hrg. Ex. 1 at 15:38-49, 16:11-16, 16:28-29, 16:34-17:23.

congregation as a whole does not matter.[29] The questions asked were ones that, from an objective standpoint, were designed to prompt, and lead Two Eagle to make, self-incriminating statements. Kumley knew Two Eagle would hear the questions and would likely be induced – because Two Eagle was an active participant in the conversations going on – to say things that could later be used against him. Keeping in mind that the focal point is the suspect's perceptions and not the officer's state of mind,[30] the Court concludes that Two Eagle was subjected to interrogation – as that term has been defined and applied[31] – in dereliction of *Miranda*.

---

[29]*See United States v. Hood*, 551 F.Supp.2d 766, 771 (W.D. Ark. 2008); *see also United States v. Reynolds*, 526 F.Supp.2d 1330, 1345 (N.D. Ga. 2007) (officers' questions to two suspects about who owned rifle found during search of residence were aimed at eliciting incriminating information and, therefore, constituted interrogation); *State v. Martin*, 343 Wis.2d at 278, 301-04, 816 N.W.2d 270, 282-84 (2012) (question posed by officer to two suspects, as to revolver's ownership, constituted interrogation); *see and compare with Haire v. Sarver*, 437 F.2d 1262, 1264 (8th Cir.) (defendant's statements correcting wife's responses were not in response to questions put to the couple jointly, but only to wife and at no time was defendant asked any questions beforehand), *cert. denied*, 404 U.S. 910 (1971); *United States v. Parker*, No. CR-11-296-D, 2011 WL 5414066 at *2 (W.D. Okla. Nov. 8, 2011) (although admission came after question posed to group, only a single question asked).

[30]*See Innis*, 446 U.S. at 301.

[31]*See generally* 2 *Criminal Procedure*, §§6.7(a)-(c) (interrogation, questioning, and other "words or actions").

### 4. Consent to Search Statements

Two Eagle's statements consenting to a DNA (buccal) swab and to Officer Kumley taking clothing and other items[32] are, however, a different story. The reason is simple: A request to search is not an interrogation that triggers the protections of *Miranda*.

A suspect's oral consent to search does not violate the Fifth Amendment because the consent is not "evidence of a testimonial or communicative nature."[33] Giving consent to swab the suspect's mouth or take his garments from him is not testimonial communication since it does not "relate a factual assertion or disclose information."[34] Although the suspect's consent may lead to the disclosure of incriminating evidence, that evidence is physical, and non-testimonial, in nature.[35]

This view comports with that taken by the Eighth Circuit and other federal circuits.[36] Inasmuch as neither *Miranda* nor the Fifth Amendment provide any basis for

---

[32] *See* Mot. Hrg. Ex. 1 at 20:21-35.

[33] *Muniz*, 496 U.S. at 589.

[34] *Id.*

[35] *See Cody v. Solem*, 755 F.2d 1323, 1330 (8th Cir.), *cert. denied*, 474 U.S. 833 (1985).

[36] *See e.g. United States v. Calvetti*, 836 F.3d 654, 662-63 (6th Cir. 2016), *cert. denied*, 137 S.Ct. 1597 (2017); *Flynn v. James*, 513 Fed. Appx. 37, 39 (2d Cir. 2013); *United States v. Villanueva-Fabela*, 202 Fed. Appx. 421, 427 (11th Cir. 2006), *cert. denied*, 510 U.S. 1061 (1994); *United States v. McCurdy*, 40 F.3d 1111, 1118 (10th Cir. 1994); *United States v. Smith*, 3 F.3d 1088, 1098 (7th Cir. 1993), *cert. denied*, 510 U.S. 1061 (1994); *United States v. Lewis*, 921 F.2d 1294, 1303 (D.C. Cir. 1990); *Cody*, 755 F.2d at 1330; *Smith v. Wainwright*,
(continued...)

suppressing Two Eagle's statements consenting to searches of his person and apparel, his Motion – to this extent – should be denied.

   5. **"Pass Out" Statement**

At some point toward the end of the parlay and while talking to Kelly and Vine, Two Eagle had this to say about Searby: "I didn't know that she was going to fucking pass out like that either."[37] Officer Kumley had spoken to Mission City Officer Andrew Red Bear (who had arrived to assist) about moving Searby to Red Bear's patrol car, but Kumley made no attempt to question anyone. Two Eagle's gratuitous and volunteered statement was not the product of interrogation. Nor was it otherwise derived from anything Kumley said or did. *Miranda* does not safeguard Two Eagle from making an unbidden admission under circumstances that Kumley neither initiated nor engendered.[38]

---

581 F.2d 1149, 1152 (5th Cir. 1978); *United States v. Lemon*, 550 F.2d 467, 472 (9th Cir. 1977); *see also United States v. Morato*, 2000 S.D. 149, ¶¶23-24, 619 N.W.2d 655, 662 (officer's request that suspect consent to search is not interrogation or its functional equivalent and suspect's consent to search does not constitute incriminating statement); *see generally*, 2 *Criminal Procedure*, §§3.10(b) & nn. 73-74, 6.7(b) & n. 78.

   [37]Mot. Hrg. Ex. 1 at 26:38-43.

   [38]*Crisolis-Gonzalez*, 742 F.3d at 837; *Howard*, 532 F.3d at 762; *Chipps*, 410 F.3d at 445; *Butzin*, 886 F.2d at 1018.

11

### 6. Two Eagle's Susceptibilities

In making its rulings as to the admissibility of Two Eagle's statements in the Government's case-in-chief, the Court has considered – as it must – whether he had any peculiar susceptibilities.[39] He did not – at least that Officer Kumley was aware of.

Officer Kumley had never met Two Eagle before and had no knowledge of Two Eagle having any distinctive vulnerabilities or propensities to make sudden impromptu remarks.[40] Whatever stimulus Kumley's words or actions in the living room that night may have created, it did not rise to the level of interrogation so as to require the exclusion of Two Eagle's unsolicited statements.[41]

### B. Voluntariness

Two Eagle also claims that the statements he made at the house were involuntary under the Fifth Amendment. He seeks to exclude these statements as both substantive and impeachment evidence.

The Fifth Amendment prohibits the use of involuntary statements at trial.[42] Whether statements are voluntary or not depends on whether they are "the product of

---

[39]See *Muniz*, 496 U.S. at 601; *Innis*, 446 U.S. at 302 & n.8.

[40]See *id.* at 303.

[41]See *United States v. Hitselberger*, 991 F.Supp.2d 130, 139 (D.D.C. 2014); *Spann v. United States*, 551 A.2d 1347, 1350-51 (D.C. 1988).

[42]See *Chavez v. Martinez*, 538 U.S. 760, 769 (2003); *United States v. LeBrun*, 363 F.3d 715, 719-20 (8th Cir. 2004) (*en banc*), *cert. denied*, 543 U.S. 1145 (2005).

an essentially free and unconstrained choice by [their] maker[ ]."⁴³ If they are, then the suspect has "willed [himself] to confess" and his statements may be used against him.⁴⁴ If they are not, then the introduction of the statements "offends due process."⁴⁵ The dispositive question is whether the statements were obtained by "threats, violence, or express or implied promises sufficient to overbear [the suspect's] will and critically impair his capacity for self-determination."⁴⁶ When deciding this question, a court must look at the totality of the circumstances, including the "conduct of the officer[ ] and the characteristics of the [suspect]."⁴⁷

Having watched the recording made of the events on the night in question, the Court concludes that the requisite coercive or overreaching conduct necessary to render Two Eagle's statements involuntary is lacking. Several facts support this conclusion.

Two Eagle was 32 years old, had a high school diploma, some college education, and could read, write, and understand the English language. Officer Kumley's conversations with Two Eagle and others in the home were short-lived, lasting less than

---

⁴³*Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973).

⁴⁴*Id.*

⁴⁵*Id.* at 225-26.

⁴⁶*LeBrun*, 363 F.3d at 724.

⁴⁷*Id.*

13

20 minutes. During that time, Two Eagle repeatedly made comments, in response to what people said, that were laced with explicatives.

These things aside, Two Eagle was never threatened or promised anything and no physical or psychological pressure was brought to bear on him. Nor were any deceptive stratagems or trickery used to get him to talk. He was coherent and generally understandable. And he did not appear to have any kind of mental or cognitive infirmities.

The fact that Two Eagle may have been intoxicated did not render his statements involuntary. "[C]ustodial statements are not *per se* involuntary because of intoxication. The standard is whether, by reason of intoxication or other factors [the suspect's] 'will was overborne' or whether his statements were the 'product of a rational intellect and a free will.'"[48] Even if Two Eagle was drunk or under the influence of alcohol when he made his statements, this condition did not cause his will to be overborne or undermine his ability to make unconstrained choices.[49] Tellingly, he had enough wherewithal to (1) make it known he was not a rapist and did not rape Searby; (2) deny he did anything to her; (3) insist he had done nothing wrong; and (4) ask why he could not be let go (i.e.

---

[48]*United States v. Brown*, 535 F.2d 424, 427 (8th Cir. 1976) (internal citations omitted); *see also Jones*, 842 F.3d at 1083; *United States v. Gaddy*, 532 F.3d 783, 789 (8th Cir.), *cert. denied*, 555 U.S. 1019 (2008); *United States v. Casal*, 915 F.2d 1225, 1229 (8th Cir. 1990), *cert. denied*, 499 U.S. 941 (1991).

[49]*See Howard*, 532 F.3d at 763; *United States v. Annis*, 446 F.3d 852, 856 (8th Cir. 2006), *cert. denied*, 551 U.S. 1163 (2007); *United States v. Allen*, 40 Fed. Appx. 313, 314 (8th Cir. 2002).

14

not charged), lay down, go to bed, or leave and smoke a cigarette outside.[50] In the final assay, Two Eagle's alcohol consumption did not affect, much less negate, the voluntariness of his statements.[51]

## C. Impeachment

Having determined that the Government may not use some of Two Eagle's statements at trial before it rests, there is left to be decided whether these statements can be utilized for impeachment purposes.

More than four decades ago, the Supreme Court held that although statements taken in violation of the prophylactic *Miranda* rules cannot be used as substantive evidence, they may nonetheless be admissible to impeach the conflicting testimony of a defendant.[52] If the defendant chooses to testify on his own behalf, then he assumes a

---

[50]*See* Mot. Hrg. Ex. 1 at 19:40-43, 20:11-18, 21:25-49, 22:34-42, 24:55-25:00, 25:11-13, 25:16-17, 26:45-47.

[51]*See Jones*, 842 F.3d at 1083; *Gaddy*, 532 F.3d at 788; *Howard*, 532 F.3d at 763; *United States v. Bordeaux*, 980 F.2d 534, 538 (8th Cir. 1992); *Casal*, 915 F.2d at 1229; *see also Annis*, 446 F.3d at 856 (no showing made that defendant's methamphetamine withdrawal or police coercion caused his will to be overborne so as to make his statement involuntary); *United States v. Turner*, 157 F.3d 552, 555-56 (8th Cir. 1998) (finding that defendant's confession was voluntary even though he was intoxicated by PCP and later exhibited "bizarre" behavior and signs of mental illness); *United States v. Givens*, 712 F.2d 1298, 1302 (8th Cir. 1983) (custodial statements of defendant, who used a variety of drugs on a regular basis and could have been intoxicated at the time, were given voluntarily), *cert. denied*, 465 U.S. 1009 (1984); *United States v. Ducheneaux*, No. CR. 02-30065-02, 2002 WL 31950204 at *6 (D.S.D. Dec. 2002) (defendant was not intoxicated to the point where he was incapable of making voluntary statements); *see generally* 2 *Criminal Procedure*, §6.2(c) & n.181.

[52]*See Oregon v. Hass*, 420 U.S. 714, 722-23 (1975); *Harris v. New York*, 401 U.S. 222,
(continued...)

reciprocal "obligation to speak truthfully and accurately,"[53] and may not "turn the illegal method by which evidence in the Government's possession was obtained to his own advantage and provide himself with a shield against contradiction of his untruths."[54] The High Court has mandated the exclusion of reliable and probative evidence for all purposes only when it has been derived from involuntary statements.[55] And the Court has never prohibited the prosecution from using relevant and voluntary statements of a defendant when the violations alleged relate only to procedural safeguards (like those outlined in *Miranda*) that are "not themselves rights protected by the Constitution"[56] but are simply measures designed to ensure that constitutional rights are protected."[57] This is because the "search for the truth" outweighs the

---

224-26 (1971).

[53]*Harris*, 401 U.S. at 225.

[54]*Id.* at 224 (*quoting Walder v. United States*, 347 U.S. 62, 65 (1954)); *see also Hass*, 420 U.S. at 723 (applying the same rational where the suspect was advised of his rights and then asked for counsel but was questioned without his request being honored).

[55]*See New Jersey v. Protash*, 440 U.S. 450, 459 (1979); *Mincey v. Arizona*, 437 U.S. 385, 398 (1978); *see also Kansas v. Ventris*, 556 U.S. 586, 594 (2009) (defendant's statements to jail house informant, concededly elicited in violation of the Sixth Amendment, were admissible to impeach his inconsistent testimony at trial); *Michigan v. Harvey*, 494 U.S. 344, 349-54 (1990) (defendant's post-arraignment statement, obtained in violation of his Sixth Amendment right to counsel, may be used to impeach his testimony).

[56]*Michigan v. Tucker*, 417 U.S. 433, 444 (1974).

[57]*Harvey*, 494 U.S. at 351.

"speculative possibility" that exclusion of evidence might deter future violations of rules that are of themselves not compelled directly by the Constitution.[58]

Based on the totality of the circumstances present here, the Court is satisfied that all of Two Eagle's statements were voluntary. The statements were ones he wanted to make and were not the offspring of an environment and questioning that was so coercive it overbore his will and shoehorned his decision making capacity.[59]

That Two Eagle was in custody does not mean he was incapable of making voluntary statements.[60] He certainly had the efficacy to speak for himself, and did so – of his own volition[61] – despite the Miranda transgression.[62]

---

[58]*Hass*, 420 U.S. at 722-23; *see also United States v. Havens*, 446 U.S. 620, 626 (1980) ("there is simply no gainsaying that arriving at the truth is a fundamental goal of our legal system" and that when defendant testifies, he must do so "truthfully or suffer the consequences").

[59]*See LeBrun*, 363 F.3d at 724; *see also Hass*, 420 U.S. at 722-23 (holding that suspect's statements made after he continued interrogation following his request for an attorney were voluntary for impeachment purposes where "the pressure on him was no greater than that on any person in like custody or under inquiry by any investigating officer").

[60]*See Innis*, 446 U.S. at 299-300; *Schneckloth*, 412 U.S. at 225-27; *Chipps*, 410 F.3d at 445; *Lockett*, 393 F.3d at 838; *Hatten*, 68 F.3d at 262.

[61]*See generally* 2 *Criminal Procedure* §6.2(c) (discussing relevant factors in totality of circumstances inquiry).

[62]*United States v. Pettigrew*, 468 F.3d 626, 636-37 (10th Cir. 2006), *cert. denied*, 549 U.S. 12421 (2007); *United States v. Carr*, 63 F.Supp.3d 226, 239-41 (E.D.N.Y. 2014).

Notably, Officer Kumley's dealings with Two Eagle did not resemble, or even approach, the gross abuses that have led the Supreme Court in other cases to suppress statements on voluntariness grounds.[63] What defines these cases and places them in the

---

[63]*See and compare with Arizona v. Fulminante*, 499 U.S. 279 (1991) (defendant, an alleged child murderer, subjected to credible threat of physical force (sufficient to make him reasonably fearful of losing his life) that overbore his will); *Mincey*, 437 U.S. 385 (where defendant, who had been seriously wounded just a few hours before, was subjected to "relentless" interrogation while lying in his hospital bed, unable to speak, severely depressed, suffering from "unbearable" pain and encumbered by tubes, needles, and a breathing apparatus); *Greenwald v. Wisconsin*, 390 U.S. 519 (1968) (defendant, on medication, interrogated for over 18 hours without food or sleep); *Brooks v. Florida*, 389 U.S. 413 (1967) (confession extracted after defendant confined naked in tiny "punishment cell" without toilet facilities except hole in one corner, forced to subsist for two weeks on daily fare of thin soup and water and under complete control and dominion of jailers); *Beecher v. Alabama*, 389 U.S. 35 (1967) (police officers held gun to wounded defendant's head to obtain confession from him); *Davis v. North Carolina*, 384 U.S. 737 (1966) (16 days of incommunicado interrogation in closed cell without windows, limited food, and overbearing tactics); *Haynes v. Washington*, 373 U.S. 503 (1963) (police made express threat of continued incommunicado detention by telling defendant he could not call his wife for purposes of contacting lawyer unless he first gave statement); *Lynumn v. Illinois*, 372 U.S. 528 (1963) (defendant told she could lose her welfare benefits and custody of her children); *Townsend v. Sain*, 372 U.S. 293 (1963) (defendant given drug with truth-serum properties by police physician and then interrogated by officers who knew he had been medicated); *Reck v. Pate*, 367 U.S. 433 (1961) (defendant held for four days with inadequate food and medical attention until confession obtained); *Culombe v. Connecticut*, 367 U.S. 568 (1961) (defendant held for five days of repeated questioning during which police employed coercive devices); *Rogers v. Richmond*, 365 U.S. 534 (1961) (defendant's confession obtained in response to police threat to take his wife into custody); *Blackburn v. Alabama*, 361 U.S. 199 (1960) (defendant, who was "probably insane" signed confession composed by deputy sheriff after being interrogated for eight to nine hours in tiny room which on occasion was filled with police officers); *Payne v. Arkansas*, 356 U.S. 560 (1958) (defendant held incommunicado for three days with little food; confession given when officers informed him police chief was preparing to admit lynch mob into jail); *Ashcraft v. Tennessee*, 322 U.S. 143 (1944) (defendant questioned by relays of officers for 36 hours without opportunity for sleep); *Brown v. Mississippi*, 297 U.S. 278 (1936) (defendant brutally
(continued...)

18

involuntariness category, is the officers' use of coercion to obtain statements from the suspects.

Two Eagle was not wrongfully coerced. He was in control of his faculties and possessed the gumption and fortitude to withstand confessing, without reservation or excuse, to sexually assaulting Searby. On this record, Officer Kumley did not overwhelm Two Eagle's will and extort incriminating statements from him. This being the case, Two Eagle's statements may be used at trial if and when he elects to testify in his own defense.

## CONCLUSION

Some of Two Eagle's un-*Mirandized* statements emanated from custodial interrogation and violated *Miranda*. These statements are excludable as substantive trial evidence. But they may be utilized to impeach Two Eagle if he testifies. The remaining statements comported with the strictures of *Miranda* and are freely admissible.

## RECOMMENDATION

Accordingly, it is hereby

RECOMMENDED that Two Eagle's Motion to Suppress Statements,[64] be granted in part and denied in part for the reasons, and based on the authorities, discussed and cited to herein. The Motion should be granted to the extent that it seeks to exclude, as

---

beaten before confessing).

[64]*See* Dkt. No. 44.

substantive – but not impeachment – evidence, the post-arrest statements he made that were not volunteered, spontaneous or self-incriminating. In all other respects, the Motion should be denied.

## NOTICE

The parties have 14 calendar days after service of this report and recommendation to file their objections to the same.[65] Unless an extension of time for cause is later obtained,[66] failure to file timely objections will result in the waiver of the right to appeal questions of fact.[67] Objections must "identify[] those issues on which further review is desired[.]"[68]

DATED this 14th day of November, 2017, at Pierre, South Dakota.

BY THE COURT:

*[signature: Mark A. Moreno]*

MARK A. MORENO
UNITED STATES MAGISTRATE JUDGE

---

[65] *See* 28 U.S.C. §636(b)(1); Fed. R. Crim. P. 59(b).

[66] *See Thompson v. Nix*, 897 F.2d 356, 357 (8th Cir. 1990); *Nash v. Black*, 781 F.2d 665, 667 & n.3 (8th Cir. 1986) (*citing Thomas v. Arn*, 474 U.S. 140, 155 (1985)).

[67] *See Thompson*, 897 F.2d at 357; *Nash*, 781 at 667.

[68] *Arn*, 474 U.S. at 155.